UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────

No. 13-cr-38 (RJS)
───────────────────────

UNITED STATES

VERSUS

VICTOR BARCELO,

Defendant.

───────────────────────

OPINION AND ORDER
August 15, 2014
───────────────────────

RICHARD J. SULLIVAN, District Judge:

On February 6, 2014, a jury found Defendant Victor Barcelo guilty of conspiracy to distribute cocaine. Now before the Court is Defendant's motion for post-trial dismissal of the indictment or, in the alternative, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. For the reasons stated below and on the record at Defendant's sentencing hearing, the Court denies the motion.

I. BACKGROUND

As demonstrated at trial, in the early morning hours of June 3, 2012, law enforcement officers pulled over Defendant's tractor-trailer on a remote road in New Jersey. (*See, e.g.*, Transcript of Trial, Doc. Nos. 108, 110, 112, 114, 116, 118, 120, 122 ("Trial Tr."), at 70:19–71:7.) After obtaining consent to search the vehicle (*see id.* at 74:5–75:7), they seized approximately 100 kilograms of cocaine (*see id.* at 79:20–25). Shortly thereafter, Defendant signed a written waiver of rights form (*see id.* at 98:5–100:12), and advised agents that (1) this was Defendant's fourth trip transporting narcotics from California to that area of New Jersey, (2) Defendant also picked up suitcases full of cash and transported that money back to California, and (3) Defendant was paid approximately $10,000 to $15,000 for each trip (*see id.* at 101:11–102:2).

Defendant was initially presented on a criminal complaint charging him with narcotics conspiracy. (*See* Doc. No. 1 ("Compl.").) On June 21, 2012, several weeks after Defendant was arrested, Defendant met with the government for a proffer session with a view toward cooperating in the government's ongoing investigation. (*See* Affirmation of Louis V. Fasulo, Esq., dated Aug. 15, 2013, Doc. No. 50-1 ("Fasulo Aff."), ¶¶ 10–11.) For the next six months, various magistrate judges granted the government's requests for extensions of the time in which to file an indictment based on the parties' representations regarding plea negotiations and Defendant's potential cooperation. (*See id.* ¶¶ 13–16, 20, 22; *see also* Transcript of Oct. 25, 2013 Conf., Doc. No. 68 ("Bench Ruling"), at 6:13–24.)

On January 16, 2013, Defendant waived indictment (Doc. No. 21) and consented to the filing of an Information charging him with conspiracy to distribute, and possess with the intent to distribute, five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Doc. No. 22). Although the parties were apparently close to a resolution of the case (*see* Transcript of May 3, 2013 Conf., Doc. No. 30 at 2:6–10), Defendant ultimately sought the appointment of new counsel (*see id.* at 8:4–5), and indicated his desire to file motions (*see id.* at 9:14–17). On June 21, 2013, Defendant filed a motion to dismiss the Information for violations of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, or, in the alternative, to suppress evidence arising out of the allegedly unconstitutional stop, search, and post-arrest interrogation. (Doc. No. 34.) The motion included a sworn affirmation from Defendant in which he claimed, among other things, to have never consented to a search of the tractor-trailer on June 3, 2012 (*see* Affirmation of Victor Barcelo, dated June 21, 2013, Doc. No. 36 ("Def. Aff."), ¶¶ 2(d)–(e)), and further claimed that Drug Enforcement Administration ("DEA") agents did not advise him of his *Miranda* rights before he made incriminating statements (*see id.* ¶¶ 2(f)–(g)).

The Court held a suppression hearing on July 26, 2013, at which DEA Special Agents Kevin Conway ("Conway") and Evan Martinez ("Martinez," and together with Conway, the "Agents") testified for the government. (*See* Transcript of Jul. 26, 2013 Suppression Hearing I, Doc. No. 46 ("Supp. Hrg. Tr. I").) Neither Defendant nor Eric Arellano ("Arellano"), Defendant's co-driver at the time of the stop and subsequently a cooperating witness for the government, testified. Given the topics raised in Defendant's Affirmation, the Agents' testimony was centered on the stop and search of the tractor-trailer, with a particular focus on the circumstances of Defendant's consent to search, as well as his waiver of his *Miranda* rights. (*See generally id*.) The Agents' testimony was generally consistent with respect to the overall timeline, indicating that: (1) Agents pulled over the tractor-trailer; (2) Martinez went to the passenger side of the tractor-trailer and Conway went to the driver's side; (3) Defendant exited on the passenger side and Arellano exited on the driver's side; (4) Defendant gave verbal consent to search the tractor-trailer; (5) Defendant was placed in the backseat of a law enforcement vehicle; (6) Defendant executed a consent to search form in the vehicle; (7) Agents searched the tractor-trailer and discovered 100 kilograms of cocaine; and (8) Defendant executed a *Miranda* advice of rights form before making incriminating statements to agents. (*See generally id.*)

Specifically, Conway testified that his gun was "out at the time [he] approached the driver's side" (*see id.* at 30:16–18), but that

2

it was holstered at the time Defendant gave verbal consent to search the tractor-trailer (*see id.* at 34:8–35:7). For his part, Martinez testified that his gun was holstered when he approached the tractor-trailer. (*See id.* at 95:15–96:9.)

With respect to Defendant's consent to search the tractor-trailer, Conway testified that Defendant was the first to consent to the search of the tractor-trailer (*see id.* at 73:22–24), and that, while Martinez was speaking to Defendant on the passenger side, Conway himself heard Defendant give verbal consent to search the vehicle (*see id.* at 32:10–19). Conway further testified that after Defendant gave verbal consent to search the tractor-trailer, Defendant executed a written consent to search form (*see id.* at 35:10–12), which specifically indicated that Defendant consented to the search of an "orange Allied truck" (*see id.* at 36:10–14). Martinez likewise testified that Defendant gave verbal consent to search the tractor-trailer sometime after exiting the tractor-trailer, and that, after being moved to the backseat of a law enforcement vehicle, Defendant executed a written consent to search form. (*See id.* at 98:19–101:24.) Martinez further testified that he did not begin searching the vehicle until after Defendant executed the consent to search form (*see id.* at 103:23–104:18), and that he did not recall "anybody doing any kind of search before the consent to search form was signed" (*see id.* at 150:3–6). Consistent with Martinez's recollection, Conway testified that after the consent to search form was signed, he and other agents searched the tractor-trailer. (*See id.* at 37:2–4.) Although at the suppression hearing the Agents could not recall whether Arellano gave verbal consent to search the tractor-trailer (*see id.* at 37:5–8 (Conway); 103:20–22 (Martinez)), the criminal Complaint, sworn by Agent Conway on June 4, 2012, asserted that Arellano consented to a search of the tractor-trailer (*see* Compl. ¶ 10; *see also* Bench Ruling at 10:4–8).

Both Agents testified that Defendant was given a copy of a *Miranda* advice of rights form after the seizure of the cocaine but before questioning – and before Defendant made incriminating statements. (*See* Supp. Hrg. Tr. I at 40:13–25 (Conway); 141:14–18 (Martinez).) The Agents both testified that they did not read the *Miranda* form to Defendant but confirmed that he read, understood, and signed it. (*See id.* at 40:17–41:16 (Conway); 107:8–108:17, 142:23–143:11 (Martinez).)

Following the testimony of Conway and Martinez, the Court set a supplemental briefing schedule to address Defendant's pending motions. (*See id.* at 176:22–178:8.) Thereafter, Defendant submitted a letter directly to the Court indicating his desire to testify with regard to the search and interrogation that formed the basis of his pending motion to suppress. (*See* Doc. No. 53 at 2–3.) Accordingly, the Court held an evidentiary hearing on September 5, 2013, during which Defendant testified. (*See* Transcript of Sept. 5, 2014 Suppression Hearing II, Doc. No. 140 ("Supp. Hrg. Tr. II").)

With respect to the search of the tractor-trailer, Defendant testified that one of the agents "cut[] the lock of the trailer." (*Id.* at 209:20–23.) Defendant's testimony was inconsistent as to the sequence of the *Miranda* waiver and self-incrimination. On direct examination, Defendant repeatedly stated that he initially remained silent about the origin of the drugs recovered from the tractor-trailer, and that he denied knowing to whom the drugs belonged. (*See, e.g.*, *id.* at 204:4–14; 212:16–25; 213:23–214:5; 219:4–6.) He also testified that he made incriminating statements only *after* signing the advice of rights form and waiving his

3

*Miranda* rights. (*See id*. at 224:4–22.) However, later in his testimony, Defendant asserted that he admitted to the Agents that he knew about the drugs *before* receiving and signing the *Miranda* form. (*See id*. at 275:5–276:4.) Following Defendant's testimony, the Court again ordered the parties to submit supplemental briefing regarding Defendant's pending motions. (*See id* at 287:21–291:25.)

On October 25, 2013, the Court issued a bench ruling denying both the Speedy Trial motion and the motion to suppress. (*See generally* Bench Ruling.) With respect to the motion to suppress, the Court found that the tractor-trailer "was lawfully stopped and searched with the consent of *both* [Defendant] and his co[-]driver, [Arellano], so that the drugs found in the course of the search are admissible." (Bench Ruling at 8:19–23 (emphasis added).) The Court further found that Defendant gave both verbal and written consent to search the tractor-trailer. (*See id.* at 10:9–12.) The Court contrasted the testimony of Martinez and Conway with that of Defendant, and noted that "[D]efendant's testimony during the evidentiary hearing . . . contradicted his [Affirmation], both as to the sequence of events and the substance of the verbal and physical interactions between [Defendant] and law enforcement." (*Id.* at 10:16–20.) Accordingly, the Court credited the Agents and discredited Defendant's testimony. (*See id*. at 10:20–25.) With respect to the *Miranda* waiver, the Court found that Defendant's "testimony [was] inconsistent," and that it could not "credit these shifting statements in light of the [A]gents' consistent and clear testimony," ultimately concluding that Defendant's waiver was knowing and voluntary. (*See id.* at 12:3–13:19.) The Court then set a trial date of December 9, 2013, and a schedule for the parties' pretrial submissions. (*Id.* at 16:8–19.)

On November 5, 2013, Defendant filed a motion for reconsideration of the Court's ruling denying his motions for dismissal and suppression (Doc. No. 65), which the Court denied on November 20, 2013 (Doc. No. 77). Meanwhile, on November 8, 2013, defense counsel sought leave to adjourn the trial for forty-five days. (Doc. No. 71.) In light of Defendant's concerns about delay in the case, the Court conditionally granted the adjournment request subject to Defendant submitting a sworn statement personally consenting to the adjournment. (Doc. No. 75.) On November 20, 2014, upon receipt of such a statement, the Court adjourned the final pretrial conference to January 24, 2014, and trial to January 27, 2014. (Doc. No. 78.)

On December 20, 2013, the government filed a Superseding Indictment, charging Defendant with conspiracy to distribute, and possess with intent to distribute, cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). (Doc. No. 79.) In comparison to the original Information, the Superseding Indictment (1) expanded the time frame of the conspiracy and (2) reduced the charges to limit the maximum sentence to 20 years and eliminate any mandatory minimum sentence. (*See id*.) The Court arraigned Defendant on the Superseding Indictment on January 2, 2014. (*See* Minute Entry of Jan. 2, 2014.) The Court held a final pretrial conference on January 24, 2014, during which the Court resolved various motions in limine not relevant to the instant motion, and granted defense counsel's request for a one-day adjournment. (*See generally* Transcript of Jan. 24, 2014 Final Pretrial Conference, Doc. No. 98 ("Pretrial Conf. Tr.").)

On January 23, 2014, Defendant issued a subpoena to the DEA (the "DEA Subpoena"), pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, seeking:

4

> Any and all documents, either paper or electronically stored[,] that the [DEA] has in its possession which pertain to best practices or guidance to Special Agents of the DEA which were applicable to official conduct on or about May and June, 2012 on the following topics: Arrest procedures, handcuffing, searches, administration of rights, consent searches, drawing of weapons, obtention of statement from subjects or arrestees.

(Doc. No. 139.) On January 25, 2014, the government moved to quash the DEA Subpoena, which specified a return date of Monday, January 27, 2014. (*See* Doc. No. 94.) On January 28, 2014, the first day of trial, the Court granted the government's motion without prejudice to renewal by defense counsel, noting that the DEA Subpoena as presented would not meet the admissibility and specificity hurdles required by Rule 17(c). (*See* Trial Tr. at 10:20–15:3.)

Trial commenced on January 28, 2014, and lasted approximately eight days, including the jury's deliberation. (*See generally* Trial Tr.) The government's evidence included, *inter alia*, the testimony of law enforcement officers, notably Conway (*see id*. at 49:12–248:17, 277:2–308:24) and Martinez (*see id*. at 901:18–1017:19); the testimony of cooperating witnesses, notably Arellano (*see id*. at 405:14–617:2, 632:11–636:7) and Andres Alvarez ("Alvarez") (*see id*. at 726:4–784:10, 805:4–901:16), who identified Defendant as the driver responsible for delivering large quantities of cocaine on multiple occasions (*see id*. at 887:17–20); physical evidence recovered from the June 3, 2012 tractor-trailer stop, including a portion of the 100 kilograms of cocaine seized (*see id.* at 1025:18–1031:6) and several cellular telephones (*see, e.g.*, *id*. at 91:20–23); call logs and records from Defendant's phone (*see, e.g.*, *id*. at 761:6–763:20); and text messages sent and received by Defendant (*see, e.g.*, *id.* at 94:12–97:4).

As relevant to the instant motion, Conway testified at trial that his gun was "holstered" at the time Arellano and Defendant were separated. (*See id*. at 74:15–21.) Varying from his testimony at the suppression hearing – but consistent with his statements in the criminal Complaint – Conway testified at trial that Arellano verbally consented to the search of the tractor-trailer "when he got out of the truck," and further noted that he "believe[d]" the consent occurred "when [they] were on the passenger side" of the vehicle. (*See id*. at 213:13–23.) Conway further stated that he "d[id]n't know who consented first," meaning he did not recall whether Defendant consented to the search "before or after" Arellano consented. (*Id.* at 214:10–13.)

Arellano testified on direct-examination that law enforcement stopped the tractor-trailer that he was driving around 2:00 a.m. on June 3, 2012. (*See id*. at 490:20–491:5.) He explained that he observed he "was being followed by quite a few vehicles," and that he pulled over because there were flashing lights "on the car directly behind me." (*Id.* at 491:17–492:2.) He further testified that after he was pulled over by law enforcement:

> [T]here was a lot of yelling going on and I heard to have our hands outside, to stick the hands out the window. I just kept saying yeah, yeah, yeah. And also too that was the time when I heard, you know, something about consent for search. I just kept saying yeah, yeah, yeah.

5

And after that I was pulled out of the truck.

(*Id.* at 492:3–10.) On cross-examination, Arellano provided more details about the stop, including acknowledging that he was very scared (*see id.* at 507:19–508:2) and in tears (*see id.* at 502:10–17). When asked whether, "during [his] first interaction" with law enforcement, the DEA agent standing outside of the driver's side door had his weapon drawn, Arellano answered affirmatively. (*See id.* at 503:5–12.) Consistent with his testimony on direct-examination, Arellano explained that he could not remember the "exact words" that the agents used at the beginning of the stop, but "remember[ed] keeping the hands out because I had my hands outside the window and . . . I kept hearing, [s]earch, consent. And I kept saying, [y]eah, yeah, yeah, and then I was taken out of the truck." (*Id.* at 504:2–9.) He testified that they "said [c]onsent to search. And I said [y]eah, yeah, yeah, because you know, they had guns drawn towards me." (*Id.* at 505:4–6.) Arellano further testified that "[t]he initial agent . . . [who] came to the side of the vehicle" was the first person to ask him to consent to the search, and that Arellano "just said . . . yeah." (*Id.* at 508:15–19.) When asked whether he understood what the agent was asking, Arellano responded, "I was just agreeing with him. I mean, they had their guns drawn. I had my hands out. I was just cooperating with what they told me to do." (*Id.* at 508:20–23.) Following these initial moments of the stop, Arellano testified that the guns were no longer drawn. (S*ee id.* at 508:3–4.)

Martinez, who testified after Arellano, stated that he "[did not] remember hearing" anyone "say to [Arellano] words like 'consent,' 'consent,' 'consent.'" (*Id.* at 963:15–18.)

During the trial, after hearing the above-referenced testimony of Arellano, defense counsel submitted a letter to the Court, dated February 3, 2014, moving for dismissal of the Superseding Indictment, or, in the alternative, to reopen the suppression hearing. (Doc. No. 101 ("Feb. 3 Motion").) The letter also sought a mistrial based on the introduction of drugs and the post-arrest statements. (*See id.*) Defendant's motion principally relied on (1) the discrepancies between Arellano's description of the June 3, 2012 stop and the descriptions of the same stop by Conway and Martinez, and (2) the fact that the substance of Arellano's testimony regarding the circumstances of the stop had not been disclosed to the defense prior to the Agents' testimony at the suppression hearing or Conway's testimony at trial. (*See id.*) The next day, the government wrote to defense counsel "to disclose prior statements made by . . . [Arellano] at a trial preparation session on January 25, 2014 concerning his arrest on June 3, 2012." (Doc. No. 125, Ex. 1 ("Feb. 4 Letter").) In the letter, the government asserted that: (1) the January 25 trial preparation session was the first time that Arellano discussed the circumstances of the stop, (2) no notes regarding the stop were taken during the session, and (3) the government did not disclose the statements to the defense "because at the time they seemed consistent with the other evidence and the prior disclosures of defense counsel." (*See id.*) The Court denied Defendant's motion without prejudice to renewal after trial. (*See* Trial Tr. at 1442:4–6.)

The government rested on February 4, 2014 (*see id.* at 1090:12), and that afternoon, the Court held a charge conference (*see id.* at 1140:2–1172:5). On February 5, 2014, Defendant put on his case, which consisted of three witnesses: his son, Victor Barcelo Jr.; his wife, Diana Barcelo; and Conway,

6

who was called as a hostile defense witness. (*See generally id*. at 1192:16–1315:16.) Conway testified that during the initial moments of the stop both Agents' weapons were drawn. (*See id*. at 1279:10–23.) With respect to the tone and volume of the Agents' voices during their encounters with Defendant and Arellano, Conway repeatedly denied that anyone was "yelling at [Arellano], consent, consent, consent" (*id*. at 1279:24–1280:6), and testified that there was no yelling at all at the very beginning of the stop (*see id*. at 1283:3–10).

On February 5, 2014, following closing arguments by counsel (*see id*. at 1317:3–1369:24), the Court charged the jury (*see id*. at 1375:2–1417:11.) On February 6, 2014, the jury began its deliberations (*see id*. at 1435:23–1436:3), and several hours later returned a guilty verdict (*see id*. at 1445:7–1449:3). The Court then set a schedule for post-trial motions. (*See id*. at 1452:24–1454:7.)

On March 6, 2014, Defendant filed the instant motion alleging various forms of government misconduct and court error and seeking a new trial or post-trial dismissal of the indictment. (Doc. No. 124 ("Def. Mot.").) The government opposed this motion on March 21, 2014 (Doc. No. 125), and Defendant submitted a reply on March 31, 2014 (Doc. No. 127 ("Def. Reply")).

## II. Legal Standard

### A. New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court may, upon the defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted). To grant a Rule 33 motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id*. (citation and internal quotation marks omitted).

### B. Post-Trial Dismissal of Indictment

"It is well established that dismissal of an indictment on grounds of governmental misconduct is an extreme and drastic sanction . . . ." *United States v. Rubio*, 709 F.2d 146, 152 (2d Cir. 1983) (citation and internal quotation marks omitted). Such a sanction should "not even be considered unless it is otherwise 'impossible to restore a criminal defendant to the position that he would have occupied' but for the misconduct." *United States v. Stein*, 495 F. Supp. 2d 390, 419 (S.D.N.Y. 2007) (quoting *United States v. Artuso*, 618 F.2d 192, 196–97 (2d Cir. 1980)).

## III. Discussion

Defendant's motion seeks two alternative forms of relief: (1) a new trial and a reopening of the suppression hearing, or (2) post-trial dismissal of the indictment. (*See* Def. Mot.) As best the Court can glean, Defendant asserts that he is entitled to such relief because (A) the government improperly suppressed material exculpatory evidence; (B) the government suborned perjury; (C) the Court gave erroneous instructions to the jury; and (D) the Court improperly quashed the DEA Subpoena. (*See id*.) For the reasons set forth below and

at Defendant's sentencing hearing, the Court finds that none of these arguments is meritorious.

A. Suppression of Exculpatory Evidence

Defendant argues that he is entitled to a new trial or post-trial dismissal of the indictment because the government violated his rights under the Due Process Clause of the Fifth Amendment by failing to comply with its obligations under *Brady v. Maryland* and *Giglio v. United States*. (*See id.*) Specifically, Defendant contends that the government "conceal[ed] and/or fail[ed] to investigate" Arellano's version of the June 3, 2012 stop, and that this conduct amounted to suppression of impeachment evidence that could have been used at both the suppression hearing and trial. (*See id.* at 1.)

As articulated in *Brady* and its progeny, the government is required to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment . . . ." *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). This duty to disclose favorable evidence includes "not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). A defendant seeking a new trial based on a *Brady/Giglio* violation must demonstrate that: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) the evidence was "suppressed by the [government];" and (3) "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). With respect to the second prong, evidence is not "suppressed" within the meaning of the *Brady/Giglio* doctrine where the defense possessed the evidence at issue in time for its effective use. *See Coppa*, 267 F.3d at 144 ("[W]e reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."); *see also United States v. Douglas*, 415 F. Supp. 2d 329, 339–40 (S.D.N.Y. 2006) ("Plainly, these documents were disclosed in time for them to be used effectively at trial: the proof of the pudding is that they were in fact used! There was thus no 'suppression' of these documents within the meaning of *Brady*." (citing *Coppa*, 267 F.3d at 144)), *aff'd*, 525 F.3d 225 (2d Cir. 2008). The third prong – prejudice – turns on an inquiry into the materiality of the evidence. *See Strickler*, 527 U.S. at 282. The key question with respect to materiality is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A defendant is deprived of a fair trial "only where there is a reasonable probability that the suppression affected the outcome of the case or would have put the whole case in such a different light as to undermine confidence in the verdict." *See United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) (citations and internal quotation marks omitted).

1. Suppression Hearing

As a threshold matter, the Court notes that the application of the *Brady/Giglio* doctrine to a suppression hearing is an open question in the Second Circuit. *See United States v. Nelson*, 193 F. App'x 47, 50 (2d Cir. 2006) (summary order) (reserving judgment on the issue). For the purposes of this motion, the Court assumes that the government does in fact have an obligation

8

to provide exculpatory and impeachment evidence to a defendant at a suppression hearing. *See, e.g.*, *United States v. Thomas*, 981 F. Supp. 2d 229, 244 (S.D.N.Y. 2013) (assuming the obligation applies, but denying the motion to suppress). Nevertheless, the Court concludes that the government did not run afoul of its *Brady/Giglio* obligations in advance of the suppression hearing because the evidence at issue – Arellano's statements concerning the June 3, 2012 stop – was not suppressed within the meaning of the *Brady/Giglio* doctrine and in any event did not result in prejudice to Defendant.

a. Suppression

The government states that it did not discuss the circumstances of the June 3, 2012 stop with Arellano until *after* the suppression hearing. (*See* Feb. 4 Letter.) Thus, the government's failure to disclose the particulars of Arellano's testimony cannot amount to suppression unless the government is deemed to have had constructive possession of Arellano's observations because of an affirmative duty to investigate. *See Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

The scope of the "duty to learn" articulated in *Kyles* is not limitless. "[A] prosecutor is only obligated to disclose information of which he has either actual or constructive knowledge." *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). With respect to constructive knowledge, "[a] prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him – those variously referred to as an arm of the prosecutor or part of the prosecution team." *Id.* (citations and internal quotation marks omitted); *see also United States v. Meregildo*, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2013) ("In the Second Circuit, a prosecutor's constructive knowledge only extends to those individuals who are an arm of the prosecutor or part of the prosecution team." (citations and internal quotation marks omitted)). To determine whether someone is a member of the prosecution team – in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual – the Court considers the totality of the circumstances, including "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 441–42 (citing *United States v. Diaz*, 176 F.3d 52, 106–07 (2d Cir. 1999)). "[I]n most cases, cooperating witnesses should not be considered part of the prosecution team." *Id.* at 444; *see also United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) (holding that, in the Sixth Amendment context, "an informant becomes a government agent [and the government may be held responsible for the actions of such informant] . . . only when the informant has been instructed by the police to get information").

Here, the record is clear that Arellano was not a member of the prosecution team. Arellano merely pleaded guilty pursuant to a standard cooperation agreement. (*See* Trial Tr. at 413:5–415:22.) There is no suggestion that he "actively investigate[d] the case, act[ed] under the direction of the prosecutor, or aid[ed] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442. Because Arellano was not a member of the "prosecution team," the government had neither a duty to learn of favorable evidence he possessed nor

constructive knowledge of the information from Arellano at issue.

### b. Prejudice

Even if Defendant *could* meet the second prong under *Brady/Giglio*, Defendant still cannot establish the prejudice prong of a *Brady/Giglio* violation because the Court would have reached the same conclusion on Defendant's motion to suppress even if Arellano's testimony was available at the suppression hearing.

Defendant argues that "[i]f the suppression hearing had included [Arellano's] testimony on the circumstances of the June 3, 2012 stop, the Court would have ruled differently on the suppression issues." (Def. Reply at 3.) This is simply not true.

Although it cannot be denied that there is tension between the testimony of Arellano and that of the Agents, the Court is not persuaded that "Arellano's cross is corroborative of [Defendant's] position that the consent to search and advice of rights forms were afterthoughts executed significantly after the drugs had been seized." (*See id.* at 5.)[1] Ultimately, the Court remains persuaded by the testimony of Conway and Martinez with respect to Defendant's consent to search the tractor-trailer and his waiver of his *Miranda* rights. The Court finds that the substance of Arellano's trial testimony – even if presented during the suppression hearing – would not have altered or otherwise "undermin[ed] confidence" in, *see Rittweger*, 524 F.3d at 180, the Court's findings with respect to *Defendant's* motion to suppress the drugs seized from the vehicle and Defendant's post-arrest statements.

Accordingly, Defendant cannot establish a *Brady/Giglio* violation in connection with the suppression hearing.

### 2. Trial

Defendant argues that the government's late disclosure of Arellano's statements concerning the circumstances of the June 3, 2012 stop constitute a separate *Brady/Giglio* violation that warrants a new trial. Although the Court concludes that the government should have disclosed Arellano's statements about the June 3, 2012 stop *before* Conway's cross-examination, the Court nonetheless finds that there is no *Brady/Giglio* violation because defense counsel was able to make effective use of

---

[1] Moreover, Defendant overstates the extent to which Arellano's testimony corroborates Defendant's version of events, as there is comparable tension between Defendant's version of events and Arellano's testimony. For example, Defendant's Affirmation provided that he "was immediately handcuffed" after he was required to exit the cab of the tractor-trailer. (Def. Aff. ¶ 2(d).) By contrast, Arellano testified that he was handcuffed at "about the same time" Defendant was handcuffed, which was about "15 to 20 minutes" after the initial stop. (Trial Tr. at 509:24–510:8.) Additionally, Defendant's Affirmation stated that "[a]lmost immediately without the consent of either myself or the driver, an agent/officer searched the tractor, seized telephones from the tractor, and then proceeded to cut the locks at the rear of the trailer" (Def. Aff. ¶ 2(e)), and his suppression hearing testimony reiterated that one of the agents "cut[] the lock of the trailer" (Supp. Hrg. Tr. II at 209:20–23). On the other hand, Arellano, as well as the Agents, testified that one of the DEA agents at the scene opened the lock on the trailer door using keys. (*See* Trial Tr. at 515:8–22 (Arellano); Supp. Hrg. Tr. I 37:9–38:3 (Conway); 105:24–106:9 (Martinez).) Similarly, while Arellano testified about the Agents yelling for consent during the initial moments of the stop (*see* Trial Tr. at 492:3–10), Defendant testified that no one had yelled at him during that period (*see* Supp. Hrg. Tr. II at 268:6–8).

this evidence at trial and Defendant was not prejudiced by the late disclosure.[2]

To reiterate the government's obligation, *Brady/Giglio* material must be provided to a defendant "in time for its *effective* use at trial . . . ." *Coppa*, 267 F.3d at 135 (emphasis added). "As long as a defendant possesses *Brady* evidence in time for its effective use, the government does not deprive the defendant of due process by not producing it sooner." *Douglas*, 415 F. Supp. 2d at 339. Despite the late disclosure of the evidence at issue, defense counsel was able to capitalize on this impeachment opportunity through (1) the cross-examination of Arellano, (2) the cross-examination of Martinez, who testified after Arellano, (3) the re-calling of Conway as a hostile defense witness, and (4) defense counsel's closing argument to the jury.[3] In his closing argument, for example, defense counsel repeatedly urged the jury to compare the testimony of Arellano with the testimony of Conway and Martinez, and to discredit the Agents based on the asserted inconsistencies. (*See, e.g.*, Trial Tr. at 1345:21–1346:3 ("[W]e have a conflict in the versions on the consent from [Arellano]. That is for you to reconcile. . . . [U]se his words and compare those with the conduct and the testimony of Agent Martinez and Agent Conway. Now, I would submit . . . they are not reconcilable.").) Defense counsel's closing argument also reminded the jury: "[Y]ou will have an opportunity to assess [the consent to search form and the *Miranda* advice of rights form]. But, one of the things you will be assessing is are they voluntary. What weight should be given to those forms?" (*Id.* at 1343:25–1344:4.)

Although "[r]ecalling a witness after a late *Brady* disclosure is no substitute for thoughtful preparation and a considered strategy," *Thomas*, 981 F. Supp. 2d at 242, the Court is persuaded that defense counsel so thoroughly harnessed the impeachment opportunity afforded by Arellano's testimony that the Court cannot imagine what else defense counsel could have done to more "effective[ly] use," *Coppa*, 267 F.3d at 135, Arellano's testimony had he known about it earlier. Indeed, the Court must presume that the jury heard defense counsel's message loud and clear since the jury, during its deliberations, requested copies of both the consent to search form and the *Miranda* advice of rights form. (*See* Trial Tr. at 1443:10–13 ("The Court: We have received a note from the jury . . . [which] says, Judge Sullivan, may we have Exhibits GX 300 [the consent to search form], GX 301 [the *Miranda* advice of rights form] . . . .").) In short, the evidence at issue was effectively used for its only possible purpose at trial – to impeach Conway and Martinez.

Moreover, Defendant cannot establish prejudice. Although the materiality analysis is not a sufficiency of the evidence test, "the strength of the independent evidence of [Defendant's] guilt increases the degree of

---

[2] The statements at issue were briefly discussed during Arellano's direct-examination (*see* Trial Tr. at 492:3–10), but more fully disclosed during Arellano's cross-examination on January 30, 2014 (*see generally id*. at 498:12–611:4) – after Conway's testimony. They were also summarized as part of the government's response to Defendant's February 3, 2014 motion. (*See* Feb. 4 Letter.) In that letter, the government informed defense counsel that it had not discussed Arellano's recollection of the stop until January 25, 2014, and that the government did not produce Arellano's statements at that time because "they seemed consistent with the other evidence and prior disclosures made to defense counsel." (*Id.*) Although it is difficult to square this explanation with the content of the statements, it ultimately has no bearing on the Court's conclusion.

[3] Defendant also had the opportunity to call Arellano and Martinez in his defense case, which he declined to do. (*See* Trial Tr. at 1169:12–20.)

significance that would need to be ascribed to the withheld impeachment evidence in order for it reasonably to undermine confidence in the verdict." *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998) (reversing district court's grant of a new trial because it "gave undue weight to the impeachment evidence itself"); *see also United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin.").

Here, the government's evidence was hardly "thin." *Id*. In addition to the physical cocaine (*see* Trial Tr. at 1025:18–1031:6) and Defendant's post-arrest confession (*see id.* at 101:11–102:2), the government introduced overwhelming evidence of Defendant's guilt at trial. This evidence included: the testimony of the Agents regarding their investigation of the underlying narcotics conspiracy (*see, e.g.*, *id*. at 59:14–68:15); the testimony of Arellano regarding the four cross-country trips that he took with Defendant in which they transported narcotics and the proceeds from their sale (*see id*. at 408:18–25); the testimony of Alvarez regarding his meetings with Defendant on multiple occasions to exchange drugs and cash (*see id*. at 887:17–20); and recordings of Title III-intercepted conversations between Defendant and another member of the drug conspiracy in which they coordinated drug deliveries and money pickups (*see id*. at 761:6–763:20). Put simply, the evidence of Defendant's guilt was nothing short of overwhelming.

Accordingly, Defendant cannot establish a *Brady*/*Giglio* violation in connection with the trial.

\*   \*   \*

Thus, Defendant is not entitled to any relief – whether in the form of a new trial or as a post-trial dismissal of the indictment – on the basis of the government's suppression of impeachment evidence.

### B.  Subornation of Perjury

Defendant also contends that he is entitled to a new trial or post-trial dismissal of the indictment on the ground that the government's witnesses "perjured" themselves, and that the government suborned that perjury at trial. (*See* Def. Mot. at 4.)

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (citations and internal quotation marks omitted). Nevertheless, "[r]eversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (citations and internal quotation marks omitted). To prevail on a motion for a new trial based on allegations of perjured testimony, the defendant must establish that "(i) the witness actually committed perjury . . . ; (ii) the alleged perjury was material . . . ; (iii) the government knew or should have known of the perjury at [the] time of trial . . . ; and (iv) the perjured testimony remained undisclosed during trial . . . ." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (citations and internal quotation marks omitted).

With respect to the first prong – the actual commission of perjury – the law is clear that "[d]ifferences in recollection do

not constitute perjury, and when testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself." *Id*. at 494 (citations and internal quotation marks omitted). It is within the jury's province to "determine whether an inconsistency in a witness's testimony represents intentionally false testimony or instead has innocent provenance such as confusion, mistake, or faulty memory." *Id.* at 495.

Although, as noted above, there are some discrepancies between the testimony of Arellano and that of Conway and Martinez, the Court finds that these inconsistencies were appropriately left for the jury to consider whether they could reasonably be explained by recollection issues and different perspectives. Surely, it is not surprising that DEA agents who had participated in numerous traffic stops and searches might have different perspectives and expectations from a driver who suddenly found himself stopped by law enforcement in the middle of the night on a deserted New Jersey road, knowing of the illicit narcotics hidden in the back of the trailer. *See id*. at 492. Arellano's emotional state – which bordered on the hysterical (*see* Trial Tr. at 502:10–17 (tears), 507:19–508:2 (very scared)) – would understandably have been different from that of the Agents, who were painstakingly tracking a load of narcotics over a period of days (*see, e.g.*, *id*. at 59:14–68:15). As such, the nature of the alleged inconsistencies and their materiality were issues properly left to the jury and do not demonstrate that the witnesses "actually committed perjury." *Josephberg*, 562 F.3d at 494.

Nor has Defendant met the fourth hurdle of the *Josephberg* test, since all of the allegedly perjured testimony was disclosed *during* the trial, and in fact was fully exploited by defense counsel.

Thus, Defendant is not entitled to any relief on the basis of the allegedly perjured testimony of the government's witnesses.

### C. Jury Instructions

Defendant next argues that he is entitled to a new trial or post-trial dismissal of the indictment based on errors in the Court's jury instructions. (*See* Def. Mot at 6–7.) Specifically, Defendant appears to be challenging two separate instructions, each of which concerns law enforcement. (*See id*.) As discussed below, the Court concludes that the challenged instructions were proper.

With respect to the first challenged instruction, the Court advised the jury:

> You've heard references to certain investigative techniques [that] were used or not used by law enforcement authorities in this case. There is no legal requirement that the government prove its case by any particular means. While you are to carefully consider the evidence presented by the government, you need not speculate as to why certain techniques were used or why others were not used. The government is not on trial, and law enforcement techniques are not your concern.
>
> Your sole concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

(Trial Tr. at 1403:9–19.) The Second Circuit has repeatedly upheld this type of instruction in which the court charges the

13


jury to "base its decision on the evidence or lack of evidence that ha[s] been presented at trial, and to focus solely on whether, in light of that evidence or lack of evidence, the jury was convinced beyond a reasonable doubt that the defendant was guilty of the crimes with which he was charged." *United States v. Saldarriaga*, 204 F.3d 50, 52–53 (2d Cir. 2000) (noting that the jury was correctly instructed that "the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty"); *accord United States v. Preldakaj*, 456 F. App'x 56, 60 (2d Cir. 2012) (summary order) (finding district court did not commit plain error by instructing the jury that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"). Here, the Court's instruction was particularly appropriate given Defendant's description of "the essence of the defense case," which turned on "repeated challenges to the quality of the government's investigation and to the voluntariness of [D]efendant's [post-arrest] statements . . . ." (*See* Def. Mot. at 6.)

With respect to the second challenged instruction, the Court charged the jury:

> You have heard testimony about evidence seized in various searches, including the search of certain locations and electronic devices.
>
> Evidence obtained in those searches was properly admitted in this case, and may be properly considered by you. Indeed, such searches are entirely appropriate law enforcement actions. Whether you approve or disapprove of how the evidence was obtained should not enter into your deliberations because I instruct you that the government's use of the evidence is lawful.
>
> You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven the defendant's guilt beyond a reasonable doubt. Once again, however, it is for you to decide what weight, if any, to give this evidence.

(Trial Tr. at 1412:17–1413:7.) The Second Circuit has also upheld this type of instruction. For example, in *United States v. Santiago*, the Second Circuit upheld the following instruction:

> You have heard testimony that the police seized certain evidence [a gun] on July 21, 1989. The evidence allegedly obtained at this time was properly admitted in this case and may properly be considered by you. Whether you approve or disapprove of how it was obtained should not enter into your deliberations. Therefore, regardless of your personal opinions, you may give this evidence full consideration, along with all the other evidence in this case, in determining whether the [g]overnment has proved the defendant's guilt beyond a reasonable doubt.

2 F. App'x 129, 130 (2d Cir. 2001) (summary order). In that case, although the defendant acknowledged that the "instruction was legally correct," he maintained that the charge "was unnecessary

14

since the admissibility of the gun was never questioned at trial" and further asserted that "the charge – particularly its statement concerning the jury's 'approv[al]' or 'disapprov[al]' of how the gun was obtained by the police – unfairly bolstered the [g]overnment's case and was likely to be prejudicial." *Id.*  Although the Second Circuit was "not untroubled" by the fact that the government requested a seemingly unnecessary charge, the Court unequivocally stated that "[t]he instruction given . . . was correct as to the law." *Id* at 131.  Here, the instruction was not only legally correct, but was also particularly appropriate given defense counsel's repeated challenges to the validity of Defendant's consent to search and the voluntariness of his post-arrest statements throughout the trial. (*See, e.g.*, Trial Tr. at 1343:25–1344:4.)

In sum, Defendant's challenge to the jury charge is unavailing as the jury was properly instructed on these two points. Thus, Defendant is not entitled to relief on the basis of the challenged instructions.

### D.  DEA Subpoena

Finally, Defendant's motion makes passing reference to the fact that the Court quashed Defendant's DEA Subpoena. (*See* Def. Mot. at 3–4.)[4]  To the extent Defendant contends that he is entitled to a new trial or post-trial dismissal of the indictment based on the Court's ruling to quash the DEA Subpoena, that motion is also denied.

Rule 17(c) of the Federal Rules of Criminal Procedure governs the issuance of trial subpoenas in criminal cases, and provides, in part, that "[o]n motion made promptly, the court may quash or modify [a] subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).  The Supreme Court has explained that in order to require production of materials pursuant to Rule 17(c), the party seeking production must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.

*United States* v. *Nixon,* 418 U.S. 683, 699–700 (1974) (citation, footnote, and internal quotation marks omitted).  In other words, the party seeking the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id*. at 700.

---

[4] Specifically, Defendant's motion cryptically states:

> [A] hearing conducted by the Court could address any uncertainties which may persist such as . . . whether the [A]gents' sworn testimony concerning DEA policies on consent searches, *Miranda* Advice of Rights, stop and arrest procedures was accurate and truthful. If the defense at every turn is denied access to [Arellano's] information despite being readily, and repeatedly, hammered by his alleged 'undisputed' consents, statements and driver status, or if the defense is actively denied access to DEA Procedures' Manuals, for example, by the government motion in succeeding in squashing [*sic*] the defense's trial subpoena for DEA materials, then it falls to and continues to require the government to stand up for and present accurate, truthful hearing and trial testimony.

(Def. Mot. at 3–4.)

15

Here, there appears to be no dispute that defense counsel sought the information referenced in the DEA Subpoena in order to impeach the Agents' credibility at trial. (*See* Pretrial Conf. Tr. at 66:21–25 ("The Court: . . . And the point I think that [defense counsel] wants to be able to make to the jury is, you can't believe these guys because they are sloppy or careless or willfully violating their own policies, right, [defense counsel]? Defense Counsel: Yes . . . .").) On the first day of trial, prior to jury selection, the Court quashed the DEA Subpoena without prejudice to renewal by defense counsel, noting that the DEA Subpoena as presented would not meet the admissibility and specificity hurdles articulated in *Nixon.* (*See* Trial Tr. at 10:20–15:3 (noting that "it is not clear to [the Court] that the defense can meet the specificity prong" and the Court is "not sure that [the DEA Subpoena] would meet the admissibility prong because even if useful in impeaching, . . . these materials would be extrinsic evidence that would not be admissible under any scenario that I can fathom at this point").)[5]

Defendant did not seek to narrow or renew his subpoena during trial. Nor has Defendant provided any post-trial argument articulating why the Court's initial ruling was erroneous. Although Defendant now maintains that he merely sought "the current provision of the Special Agent's Manual pertaining to consent searches, arrest procedures, search guidance, weapons, rights administration, etc." (*see* Def. Reply at 7), no such manual is specified in the DEA Subpoena (*see* DEA Subpoena). Nor has Defendant attempted to show that these materials were not otherwise procurable through the exercise of due diligence in the twelve months between Defendant's waiver of indictment and trial. Accordingly, Defendant is not entitled to any relief on the basis of the Court's ruling quashing the DEA Subpoena without prejudice to renewal.

IV. CONCLUSION

Having considered all the arguments and evidence, the Court is well-satisfied that "competent . . . evidence in the record supports the jury verdict," and has no concerns whatsoever that "an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (citation and internal quotation marks omitted). Indeed, the evidence at trial – including the testimony of Arellano and Alvarez, as well as the corroborating evidence, such as texts and phone records – was nothing short of overwhelming, and leaves little doubt of Defendant's knowing participation in the narcotics conspiracy. In sum, a new trial is not warranted because "letting [this] guilty verdict stand would [not] be a manifest injustice." *Id*. As such, it is clear that post-trial dismissal of the indictment is definitely not appropriate, since this sanction should "not even be considered unless it is otherwise impossible to restore a criminal defendant to the position that he would have occupied but for the misconduct." *Stein*, 495 F. Supp. 2d at 419 (citation and internal quotation marks omitted). Defendant could not conceivably meet this onerous test because he has failed to demonstrate any government misconduct, much less any prejudice resulting from such misconduct.

Accordingly, for the reasons set forth above and stated on the record at Defendant's sentencing hearing, Defendant's motion is DENIED. The Clerk of the Court is respectfully directed to

---

[5] The Court further characterized the DEA Subpoena as "a very broad request for all training manuals generally. That seems to be a request in the hope that there might be something in there that can be used to impeach a witness." (Trial Tr. at 14:10–13.)

terminate the motion pending at docket entry 124.

SO ORDERED.

*RICHARD J. SULLIVAN*
United States District Judge

Dated: August 15, 2014
      New York, New York

           *     *     *

The United States is represented by United States Attorney Preet Bharara and Assistant United States Attorneys Daniel Noble and Brendan Quigley, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

Defendant is represented by Walter Mack of Doar, Rieck, Kaley & Mack, 217 Broadway, Suite 707, New York, New York 10007.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-15-14

17